UNITED STATES BANKRUPTCY COURT                   **NOT FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
In re:                            :
                                  :
     CHIEF EXECUTIVE OFFICERS      :    Chapter  7
     CLUBS, INC.,                  :    Case No. 02-14829(SMB)
                                  :
            Debtor.               :
----------------------------------X
KENNETH P. SILVERMAN, ESQ.,        :
as Chapter 7 Trustee of            :
CHIEF EXECUTIVE OFFICERS           :
CLUBS, INC.,                       :
                                  :
            Plaintiff,            :    Adv. Proc. No. 04-4719
                                  :
     – against –                  :
                                  :
CEO CLUBS CHINA LIMITED AND CHINA  :
WORLD TRADE CORPORATION, SIMON GUO,:
JP LI, AND MANCUSO DEVELOPMENT     :
RESEARCH CENTER LIMITED,           :
                                  :
            Defendants.           :
----------------------------------X

**OPINION GRANTING MOTION TO DISMISS**
**PORTIONS OF THE SECOND AMENDED COMPLAINT**


**A P P E A R A N C E S:**

LAW OFFICES OF AVRUM J. ROSEN
Attorneys for Plaintiff
38 New Street
Huntington, New York 11743

     Avrum J. Rosen, Esq.
          Of Counsel


BACKENROTH FRANKEL & KRINSKY, LLP
Attorneys for Defendant China World Trade Corporation
489 Fifth Avenue
New York, New York 10017

     Mark Frankel, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

Kenneth P. Silverman, the chapter 7 trustee of the estate of Chief Executive Officers Clubs, Inc., filed this adversary proceeding against several defendants to recover the value of the debtor's assets that were allegedly transferred post-petition in violation of bankruptcy and non-bankruptcy law. The defendant China World Trade Corporation ("China World") moved to dismiss counts three, four, five, nine and ten in the Second Amended Complaint, dated July 11, 2005 (ECF Doc. # 32). The Court denied the motion to dismiss counts three and four from the bench, and reserved decision on the balance of the motion. For the reasons that follow, counts five, nine and ten of the Second Amended Complaint are dismissed, but the plaintiff is granted leave to replead count five.

## BACKGROUND

**A.    Introduction**

The debtor is a New York not-for-profit corporation. (¶ 13.)[1] Joseph Mancuso was the founder and president of the debtor, and is a debtor in his own chapter 7 case pending in the United States Bankruptcy Court for the Eastern District of Texas. (¶ 90.)

---

[1]      Unless otherwise stated, the citation "(¶ ___)" refers to the paragraphs in the Second Amended Complaint. The allegations are deemed to be true for the purpose of this motion to dismiss.

2

The debtor filed a chapter 11 petition in this Court on September 30, 2002. (¶ 12.) On November 27, 2002, the plaintiff was appointed the chapter 11 trustee for the debtor's estate, and after the case was converted with the debtor's consent on March 11, 2003, he was appointed the chapter 7 trustee. (¶¶ 15-17.)

**B.    CEO Clubs International Inc.**

On August 27, 2002, one month prior to the debtor's petition date and in contemplation of the debtor's bankruptcy, CEO Clubs International Inc. ("International") was formed as a New York not-for-profit corporation. (¶ 18.) The initial directors of International were Mancuso, his wife Karla Mancuso, and John Brown.[2] (¶ 20.)

International engaged in the same business as the debtor, using the same membership list, address, telephone number, website and URL address as the debtor. (¶¶ 26-29.) Mancuso testified at the debtor's § 341 meeting of creditors that he continued to use the debtor's leased premises and fixed assets to facilitate his business ventures. He also testified that he had solicited the debtor's membership to attend a seminar that he was conducting on board a two week cruise to Russia. (¶ 30.)

---

[2]    The Mancusos and Brown were thereafter appointed as directors at the Combined First Meeting of the Members and Directors held on May 30, 2003. (¶ 21.)

3

Mancuso also solicited the debtor's members to renew their membership in the "CEO Clubs" by making checks payable to "CEO Club" or "CEO Club International."   The requests were sent on "CEO Club International" letterhead, which included the debtor's facsimile number and website.  (¶ 31.)  At his February 5, 2004 deposition, Mancuso testified that International was "receiving all of the income from the various named defendant CEO Clubs throughout the United States" (¶ 38), and that he caused the debtor's internet domain name to be transferred to International for no consideration.  (¶ 41.)

Between September 2002 and February 2004, funds totaling $543,358.38 were deposited into bank accounts owned by International.  (¶ 24.)  These deposits were generated through the use of the debtor's assets and good will, and reflected income diverted from the debtor to International.  (¶¶ 24-25.)  The plaintiff commenced a separate adversary proceeding (Adv. Proc. No. 04-2820) against International on July 2, 2004 to recover the value of the debtor's assets.  (¶ 42.)

## C.   CEO Clubs, Inc.

In late June 2003, the Trustee commenced an adversary proceeding against Mancuso to enjoin him from using International or any other entity to convert the debtor's assets.  (See ¶ 59.)

4

Less than one week later, on July 2, 2003, CEO Clubs, Inc. was incorporated as a New York business corporation. It listed the same address for service of process as the debtor and International. (¶ 59. ) Like International, CEO Clubs, Inc. operated the same business as the debtor, using its name, goodwill, membership lists, phone number, office, and email and website addresses. Operating as the debtor's alter-ego, CEO Clubs, Inc. diverted assets of the debtor for no consideration. (¶¶ 60-67.)

For example, an advertisement printed on CEO Clubs, Inc. letterhead was sent to manufacturers in the New York metropolitan area (the "Manufacturers Letter") inviting the recipients to attend a breakfast seminar at the "New York CEO Clubs." (¶¶ 68-70.) The Manufacturers Letter included the debtor's emblem and slogan, and encouraged recipients to visit the same website owned by the debtor and used by International. (¶¶ 71-73.)

**D.   CEO Clubs China, Ltd.**

CEO Clubs China, Limited ("CEO Clubs China"), a Hong Kong corporation, was founded in December 2002 through the support of its partner, CEO Clubs USA. According to its website, which is hyperlinked with the debtor's website, CEO Clubs China is the "headquarters and partner of CEO Clubs USA in the Greater China region, sharing its membership resources of up to 5,000. Members

5

of CEO Clubs China will be members of CEO Clubs USA." (¶ 52.)
Defendant Li Jingping[3] is the chief executive officer of CEO Clubs
China, and defendant Simon Guo is its founder and a director. (¶¶
46-47.)

The debtor coordinated trips for its members to travel to
China in order to increase its presence in China and enable its
members to expand their business to a global market. (¶ 49.) In
contemplation of one such trip, the debtor wired $31,375.00 on
November 18, 2002 from its debtor-in-possession account to CEO
Clubs China. The transfer violated the Court's order appointing a
chapter 11 trustee. (¶ 50.)

A press release issued in 2003 listed Mancuso as the co-chair
of a meeting between American and Chinese business persons
and listed Simon Guo as the "chief of the China chapter of CEO
Clubs International." (¶ 48.) In addition, the CEO Clubs China
website contains claims that CEO Clubs China arranged for more than
100 American CEOs to visit China and for several groups of Chinese
CEOs to visit the United States. The website refers to two such
events involving boat cruises, one in China and one aboard the
Queen Mary II in New York during July 2005. (¶ 54.) The plaintiff

---

[3]     The Court assumes that Li Jingping and the named defendant, JP Li, are the same
person.

6

alleges, upon information and belief, that these cruises were advertised on the debtor's website.  (¶ 55.)

The plaintiff also alleges, upon information and belief, that CEO Clubs China solicits memberships payable in U.S. dollars and targets American business people to participate in the Chinese market.  Furthermore, it has paid and continues to pay Mancuso's personal legal expenses incurred in his personal bankruptcy case. (¶ 57-58.)  The plaintiff alleges that CEO Clubs China operates in the United States, d/b/a CEO Clubs, and in China, as the CEO Clubs China.  (¶ 81.)  Important to the present motion, the trustee alleges, again upon information and belief, that assets of the debtor's estate were transferred post-petition to CEO Clubs China from International, CEO Clubs, Inc. and other unnamed CEO Club entities. (¶ 82.)

**E.    Purchase of CEO Clubs China by China World**

Pursuant to a Share Exchange Agreement, dated April 7, 2004 (the "Share Agreement"),[4] China World purchased 51% of the issued and outstanding common stock of CEO Clubs China.  China World paid

---

[4]    The  Share Agreement is attached to China World's <u>Motion to Dismiss [the original complaint], or in the Alternative, for Summary Judgment</u>, dated February 17, 2005. (ECF Doc. # 11.)  It is incorporated by reference in, and relied on in drafting, the Second Amended Complaint.  (<u>See</u> ¶ 83.)  Accordingly, it may be considered on this motion to dismiss for failure to state a claim.  <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002).

consideration that might total as much as $726,000, (see id., at B,
p.1), and consisted of several components.  First, the shareholders
of CEO Clubs China received 80,000 newly issued shares of China
World common stock valued at $240,000, (id. at ¶ 1.1(a)), plus
$120,000 in cash (the "Acquisition Cash").  (Id. at ¶ 1.2).

In addition, China World deposited $120,000 in cash (the
"Operation Cash") into a CEO Clubs China bank account.   The
Operation Cash had two express purposes.  Under Paragraph 1.3 of
the Share Agreement, the Operation Cash was to be used to fund CEO
Clubs China's operating capital for twelve months after closing, up
to a maximum of $10,000 per month.  The Operation Cash was also to
be used "to satisfy the asset injection requirement for the
acquisition of 100% of Mancuso Development Research Center Limited,
a Beijing Corporation, the operation arm of the Clubs in China."
Finally, China World issued up to 82,000 China World "free trading
shares" valued at $246,000 to "the Sellers (and/or the
management)"[5] provided that CEO Clubs China achieved certain
performance benchmarks in the year following closing.  (Id. at ¶
1.4.)

The plaintiff alleges that Mancuso Development is owned by

_____

[5]    The Share Agreement does not define "management" but that term presumably
refers to the management of CEO Clubs China.  (See Share Agreement, at ¶ 1.4.)

8

Mancuso, (¶ 90), that China World acquired 100% of Mancuso Development, and that China World violated unspecified securities laws by failing to disclose its acquisition of Mancuso Development in its Form 10-QSB filed with the Securities Exchange Commission. (¶¶ 89, 97.)  More important, the plaintiff alleges that the Share Agreement does not correctly reflect the nature of the transaction. Noting certain perceived irregularities or questionable provisions in the Share Agreement, (see ¶¶ 92-95, 98), the plaintiff concludes that "[t]he sale was actually a sale of the assets of CEO Club which were the assets of the Debtor." (¶ 86; see ¶¶ 99-100, 105.)


**F.   This Adversary Proceeding**

The Second Amended Complaint includes ten causes of action, but only five involve China World.  The following chart summarizes the relevant counts:

| Count | Substance of the Claim |
|-------|------------------------|
| 3 | The unauthorized post-petition transfer of the debtor's assets, by CEO Clubs China to China World, should be avoided pursuant to 11 U.S.C. § 549.  (¶¶ 130-32.) |
| 4 | The estate is entitled to recover the value of the avoided transfer in a sum not less than §726,000, pursuant to 11 U.S.C. § 550(a).  (¶¶ 133-39.) |

9

| 5 | The transfer of the debtor's assets violated New York's NOT-FOR-PROFIT CORP. LAW § 1002 ("NYNPCL")[6], and the estate is entitled to recover the value of the transferred assets in a sum not less than $726,000. (¶¶ 140-46.) |
|---|---|
| 9 | The defendants' aided and abetted each other in wrongfully transferring assets from the debtor's estate, and the estate is entitled to recover damages in a sum not less than $726,000. (¶¶ 180-86.) |
| 10 | China World violated RICO, or conspired to violate RICO, by (1) failing to disclose the debtor's bankruptcy filing or its acquisition of 100% of Mancuso Development in its Form 10-QSB and (2) its acquisition of the debtor's assets with knowledge that they were assets of a New York Not-For-Profit Corporation. (¶¶ 187-99.) |

China World moved to dismiss these counts for failure to state a claim and failure to plead fraud with particularity. In the alternative, Child World requested a more definite statement. (Motion to Dismiss, dated Aug. 1, 2005, at 1)(ECF Doc. # 35.) As noted, the Court denied the motion to dismiss the third and fourth causes of action from the bench, and by implication, the alternative motion for a more definite statement. At a minimum, the Second Amended Complaint alleges that the debtor's assets were transferred post-petition without authorization, that the transfer can be avoided under § 549, that China World is a subsequent

---

[6]   In a supplemental brief, the Trustee asserted that the reference to NYNPCL § 1002 in the Second Amended Complaint was a typographical error, and that the correct section is NYNPCL § 1001. (Plaintiff's Response in Further Opposition to Motion to Dismiss Second Amended Complaint, dated Oct. 28, 2005, at ¶ 11 n.4.) ("Plaintiff's Further Opposition") (ECF Doc. # 50.)

transferee of the initial transfer, and that it is, therefore, liable for the value of the transfer under 11 U.S.C. § 550.  I reserved decision on the remaining claims.


**DISCUSSION**

### A.   RICO Violations

The relevant provision of the RICO statute, 18 U.S.C. § 1962(c), states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

To establish a claim for a civil violation of § 1962(c), a plaintiff must show that he was injured by defendants' "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir.), cert. denied, 534 U.S. 891 (2001); Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999); Azrielli v. Cohen Law Offices, 21 F.3d 512, 520 (2d Cir. 1994).  The requirements of section 1962(c) must be established against each defendant. DeFalco v. Bernas, 244 F.3d at 306; see United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987)("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a

11

defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d)."), <u>cert. denied</u>, 486 U.S. 1022 (1988).

## 1. Enterprise

The RICO statute defines an "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); <u>accord</u> <u>First Capital Asset Mgmt., Inc. v. Satinwood, Inc.</u>, 385 F.3d 159, 173 (2d Cir. 2004).  A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981).  Existence of an enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  <u>Id.</u>; <u>First Capital</u>, 385 F.3d at 173; <u>Defalco</u>, 244 F.3d at 307.  An enterprise may be either a formal legal entity or "simply a discrete economic association existing separately from the racketeering activity." <u>First Capital</u>, 385 F.3d at 173 (internal quotations omitted).  Courts must consider the "hierarchy, organization, and activities" of such association-in-fact enterprises to determine whether "its members functioned as a unit." <u>United States v. Coonan</u>, 938 F.2d 1553, 1560-61 (2d Cir. 1991), <u>cert. denied</u>, 503 U.S. 941 (1992).  "And

12

'[f]or an association of individuals to constitute an enterprise,
the individuals must share a common purpose to engage in a
particular fraudulent course of conduct and work together to
achieve such purposes.'" First Capital, 385 F.3d at 174 (quoting
First Nationwide Bank v. Gelt Funding, Corp., 820 F. Supp. 89, 98
(S.D.N.Y. 1993), aff'd, 27 F.3d 763 (2d. Cir. 1994), cert. denied,
513 U.S. 1079 (1995)).

     In addition, an enterprise is an entity separate and apart
from the pattern of racketeering activity. Turkette, 452 U.S. at
583; First Capital, 385 F.3d at 173. The pattern of racketeering
activity is a series of criminal acts as defined by 18 U.S.C. §
1961(1) committed by the participants in the enterprise. Turkette,
452 U.S. at 583. The existence of an enterprise and a pattern of
racketeering activity must be proven separately by the plaintiff
under section 1962(c). Id. Finally, the enterprise and the person
conducting the affairs of the enterprise must also be distinct.
Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161-62
(2001); First Capital, 385 F.3d at 173; Defalco, 244 F.3d at 307.

     In this case, the plaintiff has alleged an association-in-fact
enterprise consisting of all the defendants and several non-
defendants, including the Mancusos. Initially, the Second Amended
Complaint fails to adequately allege a RICO enterprise that

13

includes all of the defendants.  The Second Amended Complaint's

allegations regarding an enterprise are limited to the following

statements:

> That the Defendants violated 18 U.S.C. § 1962(c) by
> conducting or participating. . . in the conduct of the
> affairs of an enterprise. . . The enterprise was an
> association in fact, as defined in 18 U.S.C. § 1961(4),
> consisting of all the Defendants named herein.  The
> enterprise functioned as a continuing unit for the common
> purpose of transferring assets of the within bankruptcy
> estate without the knowledge or consent of the Court or
> the Chapter 7 Trustee.

(¶¶ 190-91.)


The Second Amended Complaint includes a long narrative of the

alleged relationship and transfers among all the CEO entities

described above.  In substance, the plaintiff charges that the

defendants (together with several non-defendants) participated in

a criminal scheme to transfer and conceal property of the debtor's

estate.  However, he provides no specific description of how and

when this occurred or precisely who was responsible.  For example,

the Second Amended Complaint implies that the Mancusos, and

possibly John Brown, orchestrated the transfer of the debtor's

assets to International.  But other than conclusory statements, the

Second Amended Complaint does not tie Simon Guo, JP Li or CEO Clubs

China into the enterprise until the time of the transfer to the

latter defendant.  Furthermore, the Second Amended Complaint does

not attribute any specific conduct to Mancuso Development.  Most

14

important, China World does not enter the enterprise until the end, at which point it is accused of paying value to CEO Clubs China or to its shareholders for the assets of CEO Clubs China.

In addition, the Second Amended Complaint fails to allege an enterprise that is distinct from the pattern of conduct. In <u>First Capital</u>, the Second Circuit was presented with an analogous set of facts. There, creditors of an individual debtor in bankruptcy commenced a RICO action against the debtor and various family members and closely held companies alleging an enterprise whose illegal purpose was to conceal the debtor's assets from his creditors. <u>First Capital</u>, 385 F.3d at 174. The Court noted that the complaint failed to "detail any <u>course</u> of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves--a requirement in this Circuit." <u>Id.</u> (citing <u>First Nationwide</u>, 820 F. Supp. at 98)(emphasis in original).

Similarly, in <u>Stein v. New York Stair Cushion Co.</u>, No. 04-CV-4741DRHETB, 2006 WL 319300 (E.D.N.Y. Feb. 10, 2006), the plaintiff, a judgment creditor of two of the defendants, asserted a RICO claim against the defendants and others charging that they engaged in a pattern of conduct designed to transfer and conceal the judgment debtors' assets. The District Court ruled that the enterprise

15

allegations were insufficient because the complaint failed

>to articulate an enterprise that exists as an association
>independent of the alleged pattern of racketeering
>activity. In this regard, Plaintiff does not allege that
>the association-in-fact enterprise has any purpose other
>than the execution of [the judgment debtor's] scheme to
>conceal assets from Plaintiff.
>
>. . . .
>
>As in First Capital, Plaintiff fails to allege any
>fraudulent conduct by Defendants that is separate and
>distinct from the alleged act of racketeering – in
>essence, the enterprise alleged is the pattern of
>racketeering activity.

2006 WL 319300, at *4 (emphasis in original).

Here, too, the plaintiff "does not allege that the association-in-fact enterprise has any purpose other than the execution of [Mancuso's] scheme to conceal assets from Plaintiff." Accordingly, the Second Amended Complaint fails to sufficiently allege the existence of an enterprise as required under RICO.

### 2.   Participation in Conduct of Enterprise's Affairs

Assuming, arguendo, that the plaintiff properly alleged a RICO enterprise, he must also allege that each defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c); First Capital, 385 F.3d at 175-76; DeFalco, 244 F.3d at 309. The Supreme Court has interpreted this phrase to mean participation in the operation or management of the enterprise. Reves v. Ernst & Young, 507 U.S.

16

170, 179 (1993); accord Azrielli, 21 F.3d at 521.   Although
pleading "operation or management" has typically "proven to be a
relatively low hurdle for plaintiffs to clear," First Capital, 385
F.3d at 176 (citing Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir.
2003); Defalco, 244 F.3d at 309; United States v. Allen, 155 F.3d
35, 42-43 (2d Cir. 1998)), a plaintiff must still allege facts
showing that a defendant played "some part in directing the
enterprise's affairs." Reves, 507 U.S. at 179 (emphasis in the
original).

       Here, the Second Amended Complaint does not allege or even
imply that China World participated in the operation or management
of the enterprise.   Many allegations depict the supposed
entanglement of business affairs among Mancuso, the debtor,
International, CEO Clubs, Inc. and CEO Clubs China.   However, the
plaintiff fails to allege facts showing that China World was
involved in the enterprise's business affairs, and its sole
connection to the plaintiff's charges is its purchase of assets
from CEO Clubs China.   The double use of the word "conduct" in
section 1962(c) "requires an element of direction." Reves, 507
U.S. at 178.   Here the Second Amended Complaint fails to allege
that China World played any part in the direction of the
enterprise's affairs.

17

### 3.   Pattern of Racketeering Activity

The plaintiff has also failed to allege that the estate was injured by China World's conduct of an enterprise through a pattern of racketeering activity.   See First Capital, 385 F.3d at 178 (citing Cofacredit, 187 F.3d at 242).   A pattern of racketeering activity "requires at least two [predicate] acts of racketeering activity," committed in a ten-year period, 18 U.S.C. § 1961(5), "which amount to or pose a threat of continuing criminal activity." First Capital, 385 F.3d at 178; Cofacredit, 187 F.3d at 242. Racketeering activity consists of an assortment of offenses, including "any offense involving fraud connected with a case under title 11."   18 U.S.C. § 1961(1)(D).

The analysis of the sufficiency of the allegations regarding a pattern of racketeering requires two considerations.   First, the plaintiff must allege the predicate acts as to each defendant. Second, the court must assess whether such acts attributed to each defendant amounted to or posed a threat of continued criminal activity.   See First Capital, 385 F.3d at 178-82.   The Second Amended Complaint falls short on both counts.

### a.   Predicate Acts

The Trustee alleges that China World, together with the other

defendants, engaged in a pattern of racketeering activity that consisted "of a scheme or artifice to defraud creditors and commit fraud in connection with a case under Title 11." (¶ 192.) "Allegations of bankruptcy fraud, like all allegations of fraudulent predicate acts, are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." <u>First Capital</u>, 385 F.3d at 178.   Federal Rule of Civil Procedure 9(b) states:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Rule 9(b) is designed to provide a defendant with fair notice of the plaintiff's claim, safeguard the defendant's reputation from improvident charges of wrongdoing and protect against strike suits. <u>Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.</u>, 117 F.3d 655, 663 (2d Cir. 1997); <u>O'Brien v. Nat'l Property Analysts Partners</u>, 936 F.2d 674, 676 (2d Cir. 1991); <u>DiVittorio v. Equidyne Extractive Indus., Inc.</u>, 822 F.2d 1242, 1247 (2d Cir. 1987); <u>Segal v. Gordon</u>, 467 F.2d 602, 607 (2d Cir. 1972).   Although <u>scienter</u> may be pleaded generally, the pleader must nevertheless "allege facts that give rise to a strong inference of fraudulent intent."   <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994); <u>accord</u> <u>Campaniello Imports</u>, 117 F.3d at 663; <u>Chill v. General Elec. Co.</u>, 101 F.3d 263, 267 (2d Cir. 1996).   A strong inference of fraudulent

19

intent may be established in one of two ways: "either (a) by
alleging facts to show that defendants had both motive and
opportunity to commit fraud, or (b) by alleging facts that
constitute strong circumstantial evidence of conscious misbehavior
or recklessness." <u>Shields</u>, 25 F.3d at 1128; <u>accord</u> <u>Chill v.</u>
<u>General Elec. Co.</u>, 101 F.3d at 267.


     As a rule, a pleader cannot allege fraud based upon
information and belief unless the facts are "peculiarly within the
opposing party's knowledge." <u>Schlick v. Penn-Dixie Cement Corp.</u>,
507 F.2d 374, 379 (2d Cir. 1974), <u>cert. denied</u>, 421 U.S. 976
(1975); <u>accord</u> <u>Campaniello Imports</u>, 117 F.3d at 664.  Even in those
cases, the pleader must allege facts upon which the belief is
founded.  <u>Campaniello Imports</u>, 117 F.3d at 664; <u>Schlick</u>, 507 F.2d
at 379; <u>Segal</u>, 467 F.2d at 608.  Since a bankruptcy trustee rarely
has personal knowledge of the events preceding his appointment, he
can plead fraud upon information and belief, provided that he
pleads "specific facts supporting an inference of knowledgeable
participation in the alleged fraud." <u>Devaney v. Chester</u>, 813 F.2d
566, 569 (2d Cir. 1987); <u>accord</u> <u>Nisselson v. Drew Indus., Inc. (In</u>
<u>re White Metal Rolling & Stamp Corp.</u>), 222 B.R. 417, 428 (Bankr.
S.D.N.Y. 1998).


     The Second Amended Complaint alleges two predicate acts on the

                                   20

part of China World - the bare minimum needed for a pattern under
the RICO statute.  See 18 U.S.C. § 1961(5).  First, China World
"failed to disclose in its Form 10-QSB the instant bankruptcy
filing and acquisition of 100% of defendant [Mancuso Development]."
Second, China World "acquired the assets of the estate with actual
knowledge that these assets were the property of a New York
Not-For-Profit Corporation."  (¶ 196.)  These allegations
apparently implicate 18 U.S.C. § 152(1)(knowingly and fraudulently
concealing property of the estate from a bankruptcy trustee) and §
152(5)(knowingly and fraudulently receiving a material amount of
property from the debtor after the filing with the intent to defeat
the Bankruptcy Code.[7]

The allegations do not support the inference that China World
"knowingly and fraudulently" concealed property of the estate from
the plaintiff or "knowingly and fraudulently" received property of

---

[7]     The plaintiff attempts to distinguish this case from First Capital by highlighting
the pre-petition nature of the predicate acts in First Capital.  Citing to the District Court's
opinion in First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 219 F. Supp.2d 576, 581
(S.D.N.Y. 2002), aff'd, 385 F.3d 159, the plaintiff argues that while that Court ruled that there
were insufficient facts to infer that the transfers were made "in contemplation of bankruptcy"
under 18 U.S.C. § 152 (7), that standard does not in this case because the transfers occurred post-
petition.

The plaintiff misses the point.  The District Court applied the "in contemplation of
bankruptcy" standard under 18 U.S.C. § 152 (7) because the transfers occurred pre-petition.  As
explained in the text, supra, this case involves post-petition transfers and implicates other
subdivisions of 18 U.S.C. § 152.  The plaintiff must still allege facts giving rise to a strong
inference that China World "knowingly or fraudulently" concealed or received property of the
debtor's estate.

21

the estate with the intent to defeat title 11.  At the outset, the
sole basis for the plaintiff's allegation that China World
purchased Mancuso Development is the provisions of the Share
Agreement.  Yet the Share Agreement does not support the inference.
First, it speaks of a possible acquisition in the future.  Second,
it implies that CEO Clubs China, not China World, would be the
purchaser.  The money needed to fund the purchase was placed in CEO
Clubs China's bank account.  If China World intended to buy Mancuso
Development for itself, there would have been no reason to deposit
the necessary funds with CEO Clubs China.  Furthermore, Mancuso
Development was an arm of CEO Clubs China's operations, not China
World's operations.  It would make more sense, therefore, that CEO
Clubs China would buy it.  Moreover, the gravamen of the
plaintiff's RICO claim is that China World was the last recipient
in a daisy chain of transfers of the property of the estate.
Mancuso Development was never property of the estate.

Furthermore, the Second Amended Complaint avers that China
World disclosed its purchase of CEO Clubs China in a press release,
and paid consideration totaling $726,000.  (¶ 85.)  The Second
Amended Complaint also refers to China World's Form 10-QSB, for the
period ending June 30, 2004, in which the acquisition of 51% of the

shares of CEO Clubs China was disclosed.  (¶ 85.)[8]  The plaintiff argues, based on inferences he draws from the Share Agreement, that the parties dressed up their asset sale to look like a stock deal.

But either CEO Clubs China or China World owned the debtor's assets.  Even under the plaintiff's theory, China World's disclosure still focused attention on a fraudulent transferee of the debtor's assets.  If China World was intent on concealing the daisy chain of transfers, it would not have disclosed any transaction with CEO Clubs China.  Thus, China World's public disclosure of the transaction undercuts the inference that China World acted with a fraudulent intent to conceal the transfer of property of the estate.

Odder still is the plaintiff's contention that China World's failure to disclose the debtor's bankruptcy filing in its own SEC filings was a bankruptcy crime.  There is no conceivable reason why China World would disclose this information, which was already public anyway, and if there was no reason to disclose it, no adverse inference can be drawn from the failure to disclose it.  There is simply no basis for a strong inference that China World fraudulently intended to conceal anything.

---

[8]    China World's Form 10-QSB for the period ending June 30, 2004 was attached to the original complaint as Exhibit B and incorporated by reference in the Second Amended Complaint, at ¶ 85.

The second predicate act falls into the category of receiving property of the estate with the intent to defeat the Bankruptcy Code.  This allegation is even more perplexing.  The plaintiff does not explain why the transfer would constitute a predicate act under RICO; a New York not-for-profit corporation has the power to transfer all of its assets.  NYNPCL § 202(a)(5).  In addition, the Second Amended Complaint does not allege facts indicating that China World knew that the debtor was a not-for-profit corporation. Lastly, the Second Amended Complaint asserts that China World paid a substantial amount for whatever it bought.   In short, the plaintiff failed to adequately plead the predicate acts needed to sustain his RICO claim.[9]

### b.   Pattern

The plaintiff has also failed to plead the requisite  pattern. A "pattern of racketeering activity" requires at least two predicate acts committed within a ten-year period. See 18 U.S.C. § 1961(5). The predicate acts must be related, and  "amount to, or . . . otherwise constitute a threat of, <u>continuing</u> racketeering activity." <u>H.J. Inc. v. Northwestern Bell Telephone Co.</u>, 492 U.S. 229, 240

---

[9]      The plaintiff attempts to excuse his pleading deficiencies, pointing to the more relaxed standard afforded to bankruptcy trustees where the facts constituting the fraud are "peculiarly within the opposing party's knowledge." <u>Schlick</u>, 507 F.2d at 379.  A bankruptcy trustee must still plead "specific facts supporting an inference of knowledgeable participation in the alleged fraud." <u>Devaney v. Chester</u>, 813 F.2d at 569.  The Second Amended Complaint fails to meet the relaxed standard as well.

24

(1989)(emphasis in the original).  To satisfy the requirement of continuity, "a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (<u>i.e.</u>, past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (<u>i.e.</u>, past criminal conduct 'extending over a substantial period of time')."  <u>GICC Capital Corp. v. Tech. Fin. Group, Inc.</u>, 67 F.3d 463, 466 (2d Cir. 1995)(quoting <u>H.J. Inc.</u>, 492 U.S. at 241-42), <u>cert. denied</u>, 518 U.S. 1017 (1996); <u>accord</u> <u>First Capital</u>, 385 F.3d at 180.  As noted, the plaintiff must satisfy the pleading requirement as to each defendant.

### i) Open-ended conspiracy

"To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed."  <u>First Capital</u>, 385 F.3d at 180; <u>Cofacredit</u>, 187 F.3d at 242.  In <u>First Capital</u>, the Court found that the debtor's scheme to fraudulently transfer his assets was "inherently terminable," and came to an end once he effected the transfers and filed for bankruptcy.  <u>Id.</u> at 180-81.  Given that there was "nothing left to loot," the Court held that there was no threat of continued criminal activity.  <u>Id.</u> at 181 (internal quotations omitted).

25

Here, too, there is no threat of continued criminal activity. According to the Second Amended Complaint, the debtor's assets were transferred by the debtor shortly after the petition date. Afterwards, the estate had nothing left to transfer. As in First Capital, the plaintiff has alleged a single scheme to defraud involving an initial and subsequent transfers of the same assets. See 385 F.3d at 165; accord Stein, 2006 WL 319300, at * 8. Furthermore, China World's role in the scheme, to the extent it had any, is limited to a single completed transaction. There is no threat of future criminal activity, and the plaintiff has failed to allege an open-ended, continuous pattern of racketeering.

## ii)  Closed-ended continuity

"A closed-ended pattern of racketeering activity involves predicate acts extending over a substantial period of time." First Capital, 385 F.3d at 181 (internal quotations omitted).  The Second Circuit has never found a closed-ended pattern where the predicate acts spanned fewer than two years.  Id. (citing cases).  In this case, the entire pattern of alleged racketeering lasted less than two years.  The plaintiff alleges post-petition wrongdoing, and the debtor filed its petition on September 30, 2002.  The petition date is, therefore, the earliest date of the first predicate act.

Furthermore, China World did not commit a predicate act until

April 7, 2004. On that date, it entered into the Share Agreement, and according to the plaintiff, acquired the assets of a not-for-profit corporation. Thereafter, it committed the second predicate act when it failed to disclose its acquisition of Mancuso Development and the debtor's bankruptcy filing in its Form 10-QSB filed with the SEC. The filing concerned the period ending June 30, 2004, and was signed on August 16, 2004, still well within the entire two year period and approximately four months after the first predicate act. Furthermore, any continued silent concealment of these undisclosed matters would not constitute an additional predicate act. See First Capital, 385 F.2d at 181. Accordingly, the plaintiff has failed to allege a close-ended pattern of racketeering.

**B.   RICO Conspiracy**

Finally, the plaintiff alleges that each defendant also "conspired to conduct or to participate in the conduct of the fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a) and (c)." (¶ 198.) Since the plaintiff has failed to allege a substantive violation of RICO, the conspiracy claim must fail as a matter of law. See First Capital, 385 F.3d at 182; Cofacredit, 187 F.3d at 244; Discon, Inc. V. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128 (1998).

27

Based upon the foregoing, the tenth cause of action is
dismissed for failure to state a claim upon which relief can be
granted, and failure to plead fraud with particularity.


**C.   Aiding and Abetting**

The ninth cause of action alleges the defendants aided and
abetted each other "in wrongfully diverting these assets of the
estate and transferred these assets with the intent of depriving the
Debtor's estate of the value of these assets." (¶ 184.)   In
addition, "[c]omplicity by [China World] in not disclosing this
transaction in aid of secreting assets of two bankruptcy estates is
the basis for a cause of action for aiding and abetting in the post-
petition fraudulent transfer of the Debtor's assets." (¶ 104.)
China World moved to dismiss this cause of action based upon the
failure to satisfy FED. R. CIV. P. 9(b).  (<u>See</u> <u>Motion to Dismiss</u>,
dated Aug. 1, 2005, at ¶¶ 48-52.)  The plaintiff did not respond to
this part of the motion, apparently under the mistaken belief that
China World did not move to dismiss it.  (<u>See</u> <u>Plaintiff's Further
Opposition</u>, at ¶ 18.)


In any event, the aiding and abetting claim fails to comply
with Rule 9(b).  The elements of a claim for aiding and abetting a

fraud under New York law[10] are (1) an existing fraud, (2) knowledge of the fraud, and (3) substantial assistance to the primary violator. <u>Allied Irish Banks, P.L.C. v. Bank of America, N.A.</u>, No. 03 Civ. 3748(DAB), 2006 WL 278138, at *11 (S.D.N.Y. Feb. 2, 2006); <u>Attick v. Valeria Assocs., L.P.</u>, 835 F. Supp. 103, 111 (S.D.N.Y. 1992). A defendant provides "substantial assistance" when he (1) "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed," and (2) "the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." <u>Cromer Fin. Ltd. v. Berger</u>, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)(internal citation omitted); <u>accord</u> <u>McDaniel v. Bear Stearns & Co.</u>, 196 F. Supp. 2d 343, 352. (S.D.N.Y. 2002). Furthermore, the plaintiff must show that the assistance is both substantial and knowing, and that there is "something close to an actual intent to aid in fraud or <u>scienter</u> of the conscious intent variety." <u>McDaniel</u>, 196 F. Supp. 2d at 352 (internal quotations omitted). If the defendant does not owe a fiduciary duty directly to the plaintiff, mere "inaction" cannot constitute substantial assistance. <u>See</u> <u>Sharp Int'l Corp. v. State</u>

---

[10]     It is not clear that New York law applies to this claim. CEO Clubs China is a Hong Kong corporation. (¶ 2.) According to the introductory paragraph of the Share Agreement, China World is a Nevada corporation and the corporate sellers are British Virgin Islands corporations. Finally, the Share Agreement selects Hong Kong law as the governing law. (Share Agreement, at ¶ 9.7.) Nevertheless, "[i]n cases involving the law of common law countries, New York courts generally assume that the foreign law is the same as New York law." <u>Loebig</u>, 572 F.2d at 85; <u>accord</u> <u>DataServ, Ltd. v. Mgmt. Techs., Inc.</u>, No. 90 Civ. 7759, 1993 WL 138852, at *4 n3. The Court will, therefore, apply New York law.

Street Bank and Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43,
50 (2d Cir. 2005); Diduck v. Kaszycki & Sons, Contractors, Inc., 974
F.2d 270, 284 (2d Cir. 1992); McDaniel, 196 F. Supp. 2d at 352. Rule
9(b)'s particularity standards apply to a claim of aiding and
abetting a fraud.  Allied Irish Banks, 2006 WL 278138, at *11;
Kolbeck v. Lit Am., Inc., 939 F. Supp. 240, 245 (S.D.N.Y. 1996),
aff'd, 152 F.3d 918 (2d Cir. 1998)(unpublished op.).


    The Second Amended Complaint charges a fraudulent scheme to
strip the estate's assets and transfer them beyond the reach of the
estate and its creditors.    Assuming that the plaintiff has
adequately pleaded a primary violation, his aiding and abetting
claim fails for many of the same reasons that doomed his RICO claim.
The plaintiff does not plead any facts supporting an inference that
China World knew that the debtor was a not-for-profit corporation
under New York law, that Mancuso, and possibly others, had
orchestrated the unauthorized transfer of the debtor's assets, or
that it was acquiring, for value, assets tainted by improper initial
transfers.   Furthermore, China World did not owe a fiduciary duty
to the estate, and its mere failure to disclose the purchase of CEO
Clubs China's assets is not substantial assistance.


    Finally, although the Plaintiff's Further Opposition attaches
a proposed new aiding and abetting claim and seeks leave to replead

30

it, the new claim does not solve the pleading problems.  The newly proposed ninth cause of action alleges violations of, _inter alia_, NYNPCL § 720, in connection with the scheme to defraud the estate. The underlying claim remains one based on fraud, and still falls short under Rule 9(b).  Accordingly, the ninth cause of action is dismissed without leave to replead.


**D.   NYNPCL Claim**

The fifth cause of action alleges that the assets of the debtor were transferred in violation of Article 10 of the NYNPCL, and seeks damages against China World in the amount of $726,000.  Article 10 addresses the non-judicial dissolution of a not-for-profit corporation.  Section 1001 specifies the procedure that governs the adoption of a plan of dissolution.  It states:

> (a) The board shall adopt a plan for the dissolution of the corporation and the distribution of its assets. Such plan shall implement any provision in the certificate of incorporation prescribing the distributive rights of members.

> (b) If the corporation is a Type B or Type C corporation and has no assets to distribute at the time of dissolution, the plan of dissolution shall include a statement to that effect, and a certified copy of such plan shall be filed with the attorney general within ten days after its adoption by the board.

NYNPCL § 1001.  The plaintiff alleges that "[a] plan of dissolution and distribution of assets of the Debtor was not filed with the

31

Office of the Attorney General," in violation of NYNPCL § 1001(b).[11]
(¶ 143.)

The claim is based on two unwarranted assumptions, one legal
and one factual.  The first is that a not-for-profit corporation can
only dispose of all or substantially all of its assets through a
plan of dissolution.  A not-for-profit corporation is empowered,
however, to transfer all of its assets outside of a plan of
dissolution, and depending on the type of not-for-profit
corporation, without the involvement of the New York attorney
general or the state courts.  See NYNPCL § 510(a)(1) & (a)(2).[12]

---

[11]     As noted supra at note 6, the Second Amended Complaint's reference in the Fifth
Cause of Action to NYNPCL § 1002 was a typographical error and the correct section is 1001.

[12]     NYNPCL § 510 (a) provides:

A sale, lease, exchange or other disposition of all, or substantially all, the
assets of a corporation may be made upon such terms and conditions . . . as may
be authorized in accordance with the following procedure:

(1)  If there are members entitled to vote thereon, the board shall adopt a
resolution recommending such sale, lease, exchange or other disposition. The
resolution shall specify the terms and conditions of the proposed transaction,
including the consideration to be received by the corporation and the eventual
disposition to be made of such consideration, together with a statement that the
dissolution of the corporation is or is not contemplated thereafter. The resolution
shall be submitted to a vote at a meeting of members entitled to vote thereon,
which may be either an annual or a special meeting. . . .  At such meeting by two-
thirds vote as provided in paragraph (c) of section 613 (Vote of members) the
members may approve the proposed transaction according to the terms of the
resolution of the board, or may approve such sale, lease, exchange or other
disposition and may authorize the board to modify the terms and conditions
thereof.

The second incorrect assumption relates to the debtor's status.

NYNPCL § 201[13] sets forth four types of not-for-profit corporation,

_____

(2) If there are no members entitled to vote thereon, such sale, lease, exchange or other disposition shall be authorized by the vote of at least two-thirds of the entire board, provided that if there are twenty-one or more directors, the vote of a majority of the entire board shall be sufficient.

(3) If the corporation is, or would be if formed under this chapter, classified as a Type B or Type C corporation under section 201, (Purposes) such sale, lease, exchange or other disposition shall in addition require leave of the supreme court in the judicial district or of the county court of the county in which the corporation has its office or principal place of carrying out the purposes for which it was formed.

Emphasis added.

[13]      NYNPCL § 201 provides:

(b) A corporation, of a type and for a purpose or purposes as follows, may be formed under this chapter . . .

Type A--A not-for-profit corporation of this type may be formed for any lawful non-business purpose or purposes including, but not limited to, any one or more of the following non-pecuniary purposes: civic, patriotic, political, social, fraternal, athletic, agricultural, horticultural, animal husbandry, and for a professional, commercial, industrial, trade or service association.

Type B--A not-for-profit corporation of this type may be formed for any one or more of the following non-business purposes: charitable, educational, religious, scientific, literary, cultural or for the prevention of cruelty to children or animals.

Type C--A not-for-profit corporation of this type may be formed for any lawful business purpose to achieve a lawful public or quasi-public objective.

Type D--A not-for-profit corporation of this type may be formed under this chapter when such formation is authorized by any other corporate law of this state for any business or non-business, or pecuniary or non-pecuniary, purpose or purposes specified by such other law, whether such purpose or purposes are also within types A, B, C above or otherwise.

33

defining each according to the purpose or purposes for which it was formed. NYNPCL § 1001(b) requires a plan of dissolution to be filed with the attorney general only if (a) the corporation is a Type B or Type C (and, in appropriate cases, a Type D[14]) not-for-profit corporation and (b) has no assets to distribute at the time of dissolution. NYNPCL § 1001(b) does not apply to a Type A not-for-profit corporation.

The Second Amended Complaint does not allege facts bearing on type that fits the debtor. The plaintiff nevertheless argues in the Plaintiff's Further Opposition that the debtor is a Type B not-for-profit corporation. (Id., at ¶ 10.) This is certainly wrong. Type B corporations qualify for tax exempt status under the Internal Revenue Code, 26 U.S.C. § 501(c)(3), and are "established primarily to benefit society in general as opposed to the members of a not-for-profit corporation." E. LISK WYCKOFF, JR., PRACTICE COMMENTARIES, 37 MCKINNEY'S CONSOL. LAWS OF N.Y., NYNPCL § 201, at 63 (2005). "This type of corporation is also more carefully regulated then Type A corporations because of the public benefit purpose and because of

---

[14]     NYNPCL § 201(c) provides, in part:

A type D corporation is subject to all provisions of this chapter which are applicable to a type B corporation under this chapter unless provided to the contrary in, and subject to the contrary provisions of, the other corporate law authorizing formation under this chapter of the type D corporation.

34

public funding." Id.; cf. Santos v. Chappell, 318 N.Y.S.2d 570, 579 (N.Y. Sup. Ct. 1971)("Trade associations which operate strictly as such are type 'A' corporations."). The debtor seems to have been designed as a trade association to benefit its members rather than to benefit society as a whole.

Furthermore, NYNPCL § 1001(b) only applies where the dissolving not-for-profit corporation does not have any assets to distribute at the time of the dissolution. Since the gravamen of the Second Amended Complaint is that the debtor distributed assets, § 1001(b) does not apply for this additional reason.

This does not, however, end the discussion. Although the Second Amended Complaint does not state a claim under NYNPCL § 1001, the plaintiff may yet be able to state a claim under another provision of the NYNPCL. The Second Amended Complaint implies that the debtor's members transferred all of the debtor's assets without complying with NYNPCL § 510(a), quoted in a preceding footnote. NYNPCL § 720(a)(2) gives the plaintiff standing to set aside any unlawful conveyance "where the transferee knew of its unlawfulness." The plaintiff may be able to allege a legally sufficient claim against China World under NYNPCL § 720, and is granted leave, as requested in the Plaintiff's Further Opposition, to re-plead his

35

fifth cause of action.[15]


    In conclusion, the motion to dismiss is denied with respect to the Third and Fourth Causes of Action, and is granted with respect to the Fifth, Ninth and Tenth Causes of Action.  The plaintiff is granted leave to replead the Fifth Cause of Action within ten days, and the parties are directed to contact chambers to arrange a status conference.  Settle order on notice.


Dated:    New York, New York
          March 8, 2006


                         /s/ *Stuart M. Bernstein*
                         STUART M. BERNSTEIN
                    Chief United States Bankruptcy Judge



_____

[15]     Cases interpreting N.Y. BUS. CORP. LAW § 720(a) (2) (McKinney 2003), which is identical to NYNPCL § 720(a)(2), have held that a "knowing transferee [is] liable thereunder to the corporation and its creditors." Atlanta Shipping Corp. v. Chemical Bank, 631 F. Supp. 335, 350 (S.D.N.Y. 1986), aff'd, 818 F.2d 240 (2d Cir 1987); accord Wedtech Corp. v. Nofziger (In re Wedtech Corp.), 88 B.R. 619, 624 (Bankr. S.D.N.Y. 1988).  The plaintiff must allege that the transferee had knowledge of the unlawfulness of the transfer.  Wedtech Corp. v. Denlinger (In re Wedtech Corp.), 121 B.R. 286, 290 (Bankr. S.D.N.Y. 1990).  In granting leave to replead, the Court is not deciding whether the proposed fifth cause of action attached to the Plaintiff's Further Opposition is legally sufficient, or whether the allegations of the transferee's knowledge must satisfy FED. R. CIV. P. 9 (b).